## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

LANGFORD CONSTRUCTION COMPANY,

        **Plaintiff,**

**vs.**                                    **Case No. 3:05cv388/MCR /MD**

**CARSON-LOVELL, INC., and
CARSON CONSTRUCTION, INC.,**

        **Defendants.**

_____/

## O R D E R

This diversity action was removed from the Circuit Court in and for Escambia County, Florida.  Plaintiff Langford Construction Company ("Langford") sues defendants Carson-Lovell, Inc. ("Carson-Lovell") and Carson Construction, Inc. ("Carson Construction") for breach of contract and unjust enrichment; Langford also sues Carson-Lovell for action on a commercial account.  The court tried the matter without a jury in a two-day trial[1] and took under advisement the motion to dismiss made by defendants at the close of Langford's case.  The court has considered all of the testimony and evidence presented at trial by plaintiff and defendants, as well as the pleadings and the argument of counsel. As set forth below, the court concludes that Langford has failed to establish its claims by a preponderance of the evidence and therefore that defendants' motion should be GRANTED and Langford's claims DISMISSED, with prejudice.[2]

---

[1]  The trial was recorded by a court reporter but no official transcript has been ordered or filed.

[2]  Under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), federal courts sitting in diversity apply state substantive law and federal procedural law. See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). Effective December 1, 1991, under the federal rules a motion to dismiss in a bench trial on the ground that a plaintiff's evidence is legally

**Federal Rule of Civil Procedure 52**

In considering a motion pursuant to Rule 52(c), the court not only determines matters of law but it also decides matters of fact. See United States v. $242,484.00, 389 F.3d 1149, 1172 (11th Cir. 2004). Accordingly, the court may resolve conflicts in the evidence and make credibility determinations. See Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1504 (11th Cir. 1993); Stearns v. Beckman Instruments, Inc., 737 F.2d 1565, 1568 (Fed. Cir. 1984).  Rule 52(a) requires a district court sitting without a jury to make findings of fact and conclusions of law and to do so with enough specificity for a reviewing court to identify those factual findings upon which the court's legal conclusions are based.  See Feazell v. Tropicana Products, Inc., 819 F.2d 1036, 1041-42 (11th Cir. 1987).  The rule does not, however, require the court to make a finding on every contention raised by the parties. Id.  The court should "evaluate the evidence without making special inferences in the plaintiff's favor . . . and [should] resolve the case on the basis of preponderance of the evidence." Emerson Electric Co. v. Farmer, 427 F.2d 1082, 1086 (5th Cir. 1970)[3]; Grant v. Bullock Board of Education, 895 F.Supp. 1506, 1509 (M.D.Ala. 1995).  "[I]f the judge determines, after weighing the evidence, that the plaintiff has not established a claim for relief, the motion for a judgment on partial findings may be granted even if the plaintiff has established a prima facie case." Cherrey v. Thompson Steel Co., Inc., 805 F.Supp. 1257 (D.Md.1992); see also Martinez v. U.S. Sugar Corp., 880 F.Supp. 773, 775 (M.D. Fla.1995) (citing Cherrey).

In accordance with the requirements of Rule 52, the court enters the following findings of fact and conclusions of law.

**Findings of Fact**

1.     Langford is a Georgia corporation that is licensed to act as a general building

---

insufficient should be treated as a motion for judgment on partial findings. See Fed.R.Civ.P. 52(c), and Fed.R.Civ.P. 41(b) Advisory Committee Notes. As provided in Rule 52(c), in this case the court declined to render any judgment until the close of all the evidence.

   [3] Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

contractor in the State of Florida.  Phil Langford is the company's president and his brother Steve Langford is the chief financial officer.   Icon is an insurance restoration company that is a wholly owned subsidiary of Langford.

2.      Carson-Lovell is a Florida corporation whose stockholders are Adrian Lovell ("Lovell"), a professional engineer, and Edwin Carson ("Carson"), a general contractor. The company owns and manages commercial property in the Pensacola, Florida, area.

3.      Carson Construction is a Florida corporation located in Pensacola that is owned by Carson.  The company is a building construction firm.

4.      Hurricane Ivan struck the Pensacola area on September 16, 2004, causing extensive damage to homes, businesses, and other properties. The community's transportation, communication, energy, sewage, and water systems were also severely affected. While the emergency conditions created by the storm eased after several weeks, the damage and consequent rebuilding efforts continued to cause enormous disruption in the Pensacola area for months.  The disruption was exacerbated by critical shortages of materials, equipment, and labor.   Particularly within the building industry, business conditions were strained and at times somewhat chaotic.

5.      Phil Langford and Lovell have known each other since they attended elementary school together in La Grange, Georgia, where Langford is based.  Shortly after the storm Lovell and Richard Willey ("Willey"), another friend of Lovell's who at the time was a project manager for Langford, spoke in La Grange, where Lovell had gone to purchase emergency items.  Willey and Lovell informally discussed the possibility of Langford's entering into an agreement to repair hurricane-damaged properties for Lovell.

6.      On September 21, 2004, a meeting was held in Pensacola to discuss repairing specific properties that had been damaged by Hurricane Ivan. Notes of the meeting prepared by Willey list the following attendees and whom they represented:

Richard Willey
Ronnie Stewart
Adrian Lovell - PTAC [Lovell's professional engineering firm]
Ed Carson - Carson-Lovell Development
David Barton - C/L Project Mgr.
Danny Zimmern - C/L Real Estate

(See Plaintiff's Exhibit 5).

Willey's notes identify sixteen possible repair projects, which he copied from a list written on an erasable board located in Lovell's office.   The list included two projects identified as "Jacobs" and "Jacobs Res."

7.      After the September 21st meeting Willey, Steve Langford, and Phil Langford drove to Pensacola to discuss  the general terms of an agreement to engage Langford's services with Carson and Lovell.  Because Steve Langford had concerns about the validity of his Florida contractor's license at that time, he and Carson agreed that emergency work performed by Langford would be handled through Carson Construction. All quotes for work to be completed by Langford were to be made by Carson so that he would be aware of the nature, scope, and cost of the work being performed.

8.      On October 4, 2004, Steve Langford sent an e-mail to Lovell.  In the e-mail Steve Langford outlined and confirmed the terms of the verbal agreement reached between the Langford brothers, Carson, and Lovell for the rebuilding projects and the insurance adjusting.  The e-mail represented the only written memorialization of this agreement; no formal contract was ever drafted or signed.  The e-mail (copies of which were sent to Phil Langford, Willey, and Vann Brannon, an Icon employee) stated in part:

> In order to best organize our efforts to get your properties back into operation as quickly as possible and to accomplish the other ends we discussed, I have prepared the attached spreadsheet for listing and prioritizing the affected properties.
>
> Please complete this information as soon as possible and return to me.  The items highlighted in yellow are the properties we all ready [sic] have on our list[;] just provide the requested information for these.  You may add any additional properties that you or your friends choose to put on the list in the blue highlighted area.  Please be as thorough as possible.
>
> * * *
>
> We are essentially providing two services in this matter.  Vann will prepare all necessary insurance estimates in the accepted (required) manner and will assist you in all negotiations until each property claim is paid.  **Our fee for this work will be 5% of the settlement amount on your properties.**  If you would like for us to work with other owners, the fee will be 6% and you are welcome to quote a higher fee and earn the difference if you choose.

Payment is due upon your receipt of insurance proceeds.  We are also completing actual emergency repairs to the listed properties and any others that you might add.  This work will be completed on o[u]r standard arrangement for emergency/catastrophe work: **Cost of the work plus 20% overhead and 20% profit**.  Billing will be bi-weekly and payment is expected upon your receipt of each bill. * * *

We look forward to helping you put you[r] business back in order as well as that of anyone you might refer.  We do, however, request that any references be people or organizations that you can assure will make full payment for our services if other than Ed and you.

(Plaintiff's Exhibit 6 (emphasis in original)).

9.      Steve Langford did not anticipate that Langford would solicit work from third-party homeowners; his reference to obtaining "full payment" in his e-mail was simply to make certain that Langford would be paid for any work it performed for friends and associates of Carson's and Lovell's.  Lovell thought this reference meant that Langford intended to do business with others besides himself and Carson; he further understood the reference to mean that Steve Langford desired references regarding customers referred by Carson and Lovell in order to assure that Langford received payment from those customers.

10.     The spreadsheet referenced in Steve Langford's October 4, 2005, e-mail listed fifteen properties.  The majority of these properties belonged to Carson-Lovell, who rented them to government and various commercial tenants.  One of the properties, however, was a building on Davis Highway owned by their business associate Tony Jacobs ("Jacobs"),[4] which Jacobs used in connection with his ice cream franchise.  (Plaintiff's Exhibit 7).  Jacobs' residence was not listed in the spreadsheet.

11.     By e-mail dated October 14, 2004, Willey advised Steve Langford that Lovell had approved eight new jobs; two of the listed properties were "Tony Jacobs Ice Cream" and "Tony Jacobs Residence."  (Plaintiff's Exhibit 9).  Because Willey needed to account for

---

[4] Jacobs, along with a business partner, owned another property on Davis Highway with Carson and Lovell that the four men intended to develop.  During 2005 Carson and Lovell sold their interest in this property to Jacobs and his business partner for approximately $40,000.  That transaction was unrelated to the billing dispute which is the subject of this litigation.

all of the hours spent by Langford workers in Pensacola, including time spent on preliminary inspections which did not culminate in actually performing repair work, he requested identification code numbers from Steve Langford for these projects.  As of October 14, 2004, Lovell had instructed Willey that work could proceed on the jobs listed on the board in Lovell's office; those jobs included Jacobs' business property and his residence.

12.     In the months following Hurricane Ivan Langford worked on approximately twenty properties in the Pensacola area at Carson's instruction, including Jacobs' commercial property.  No work was ever done on at least two of the eight "new" properties initially considered to be potential projects in the October 14, 2004, e-mail. The Langfords were not aware of the details of the financial arrangements between Carson Construction or Carson-Lovell and the owners of the properties Langford repaired.  Langford provided minimal quantities of materials for these repair projects; the majority of the costs charged by Langford were for labor and labor-related expenses.

13.     Carson-Lovell paid the invoices submitted by Langford for the work it completed on Jacobs' commercial property.[5]  The subject of the dispute between the parties in this case involves only the work performed on Jacobs' residence located at 47 Bayshore Drive, Pensacola.[6]

14.     In mid-October 2004 Jacobs contacted Carson about repairing his residence, which had received extensive damage to the roof as well as the exterior and interior of the building as a result of Hurricane Ivan.  Near the end of October – probably on October 28th – Carson met with Langford employee Lee Bryan ("Bryan") at the Jacobs' residence to discuss the repair work to be done.  Carson anticipated tearing the roof off and replacing

[5] As part of its work on the Jacobs' commercial property Langford installed a garage door. Jacobs attempted to pay Langford directly, with cash in a sealed envelope.  Because of the contractual arrangement Langford had with Carson and Lovell, however, Willey returned the envelope to Jacobs unopened.

[6] Carson-Lovell paid all of Langford's invoices without disagreement, with the exception of those pertaining to the Jacobs' residence and Langford's first invoice, as to which a question was raised regarding what Langford's total markup for costs and profits should be (40% as opposed to 44%).  The parties eventually agreed on a 40% markup.

it but Bryan thought the roof might simply be patched.  The two men also walked through the house to inspect the interior.

15.     Jacobs was eager to obtain a price for the work so that he could determine whether he could afford to start repairs before receiving his insurance proceeds.  He expected that labor and materials shortages would soon worsen and result in further delays.  Jacobs called Carson repeatedly about the bid before he finally received it from Carson on October 28th or 29th.  The bid, which was dated October 25, 2004, proposed to remove, repair, and replace the roof and remove debris for $47,850.  (Plaintiff's Exhibit 11).

16.     Before leaving Pensacola on October 29th for a short trip, Jacobs called Carson and rejected the bid.  Jacobs thought the proposal for doing primarily the roof was excessive and, having other contractors in mind to repair the residence, he advised Carson that he planned to go "another route" in completing the work. At this time, although the Jacobs' residence job remained on Lovell's board of projects – a list that was first created on September 21st – neither the Langfords nor Willey was aware that Carson Construction had submitted a bid for the work or that Jacobs had rejected the bid.  Lovell likewise was not aware of the bid or Jacobs' rejection of it; accordingly, the Jacobs' residence project remained on Lovell's board largely because he was not aware of any change in its tentative status.

17.     Prior to his leaving Pensacola on October 29, 2005, Jacobs was approached by Bryan, who asked if Jacobs had received Carson's bid.  Upon Jacobs' advising Bryan that the bid had arrived but that he had found it to be unacceptably high, Bryan inquired if Jacobs would still be interested if the job could be done more cheaply; Jacobs indicated that he would be and asked Bryan "to give him some prices."  Jacobs was uncertain at that time as to whether Bryan was proposing to perform the work under the arrangement involving Langford and Carson or by agreement with Langford alone.

18.     Bryan submitted a cost estimate to Jacobs dated November 1, 2004, on Langford letterhead, which Bryan signed as "project manager."  The letter provided in part:

> We at Langford would like to thank you for the opportunity to assist you in this project.  As agreed upon in our meeting, we agree to the following scope of work on your residence at 47 Bay Shore Drive.  We agree to provide all

material, labor, equipment, and supervision to perform the following:

- Remove all drywall in designated rooms
- Remove all insulation in designated rooms
- Remove all remaining covering in the area below heated spaces
- Removal of bathroom fixtures as directed
- Remove all remaining shingles from roof
- Removal of all debris from property
- Install new soffits
- Install new felt
- Install new flashing
- Install new facer panels
- Install new architectural shingles
- Remove all floor covering

The estimated cost of the above is $20,000.00.

(See Plaintiff's Exhibit 14).

19.     Upon Jacobs' receipt of the November 1, 2004, letter from Bryan, Jacobs concluded that the repairs to his residence would be pursuant to an agreement with Langford alone. Jacobs reached this conclusion based on the facts that the letter was on Langford stationery, he had previously rejected Carson's bid, and the scope of the work suggested by Bryan was much broader than the roof repair alone that Carson had proposed.  Jacobs thought that Carson was not involved in the current project and he did not attempt to contact him to discuss the terms of the cost estimates from Langford or to attempt to renegotiate his October 25, 2004, bid.  Jacobs authorized Bryan to proceed with repairs on his residence and the work commenced.

20.     After Jacobs' October 29th rejection of Carson's bid and Bryan's submission of quotes to Jacobs commencing November 1st, neither Carson nor Lovell directed or authorized Langford, through Bryan, Willey, or any other person, to work on the Jacobs' residence.

21.     Carson Construction usually pulled the building permits for the projects Langford worked on but Jacobs himself obtained the permits for the work performed on his residence.  Jacobs also hired and paid certain subcontractors, including the electrical, plumbing, and stucco subcontractors, for work they performed on the residence;

additionally, Jacobs paid directly for some materials or labor that had been included in the estimates.  During the course of the job, Jacobs and Bryan renegotiated some of Bryan's original cost estimates, in part because as the work progressed Jacobs wished to have the residence remodeled as well as repaired.

22.     Willey noted in a Langford memorandum dated November 10, 2004, that roof and sheetrock work at the Jacobs' residence was underway.  (Plaintiff's Exhibit 15).  It was Willey's understanding that Carson was assisting Bryan with this project.  In a memorandum dated November 15, 2004, Willey stated that several additional days of demolition remained to be completed at the Jacobs' residence; he expected that interior framing and sheetrocking would commence soon.  (Plaintiff's Exhibit 17).

23.     In letters dated November 17th (two letters), 18th and 24th to Jacobs, Bryan outlined the interior and exterior work to be performed on the Bayshore Drive residence by Langford and identified the estimated costs for the various jobs to be $3850.00, $10,598.00, $18,500.00, and $10,500. (See Plaintiff's Exhibits 19, 20, 37, and 25).  As with his November 1st letter, Bryan's additional letters were on Langford stationery, employed introductory language from a form Langford business letter, and were signed by Bryan as "project manager."   Each of the letters indicated that Langford agreed to provide "all material, labor, equipment, and supervision to perform" the listed work.  Bryan intended that the prices he gave to Jacobs in these letters were to be considered time and materials estimates only which included Langford's 20% overhead but not its profit margin markup or any markup to be added for Carson-Lovell.   Jacobs, however, thought that all of the letters were being presented on behalf of Langford only and that the amounts estimated would be the actual cost to him, with no additional markups to be included later.  Jacobs felt that he could rely on the face amounts of the estimates given in Bryan's letters; the estimates, without referencing or providing the actual amount of any markups,  would have been useless to him otherwise.

24.     Carson authorized Langford personnel to charge miscellaneous materials on his accounts at local building supply businesses for projects on which Langford worked. Although Carson initially required his personal approval each time the accounts were used,

this soon proved unwieldy given the exigencies of the time. Carson then permitted Langford employees to charge materials without his express authorization for each expenditure and they did so, including with respect to the Jacobs' job.

25.     Due to the exigent circumstances in Pensacola immediately after Hurricane Ivan and because of Carson's contacts in the building industry and the local community, Carson at times assisted persons and businesses for whom he was not doing repair work in locating equipment and materials.

26.     Carson Construction field superintendent David Barton ("Barton") arranged for the placement of a dumpster and portable restrooms at the Jacobs' residence worksite, assisted Bryan in locating a roofer and sheetrock finishers for the Jacobs' job, and inspected some excess lumber on the job.  Barton did not, however, supervise or direct the work at the Jacobs' residence.  Additionally, neither Bryan nor Willey coordinated with Barton to perform work on the Jacobs' residence.

27.     On November 18, 2004, Langford sent an invoice for various repair projects to Lovell, its third invoice since commencing work in Pensacola and its first with respect to the Jacobs' residence job.  Langford billed the amount of $14,449.04 for work performed on the Jacobs' residence, which included Langford's markup of 20% overhead and 20% profit. (Plaintiff's Exhibit 21).   Travel, per diem, and expendable costs, which were set out separately rather than allocated to specific jobs, were also charged on the invoice.

28.     Sometime near Thanksgiving Bryan contacted Carson to obtain the specifications for the "blow-out" walls of Jacobs' residence.  Carson provided the technical information Bryan requested but was not aware that it was to be used in connection with the Jacobs' residence job. Other than that communication and the walk-through in connection with the bid dated October 25, 2004, Bryan had no contact with Carson while working on the Jacobs' residence.

29.     Jacobs, with the idea of trying to offer more business to Bryan and his crew because it was his impression that Bryan was eager to take on more work for Langford, requested information regarding the erection of two steel structures and the remodeling of another building.   (Plaintiff's Exhibit 18).  Because of Langford's contractual arrangement with

Carson and Lovell, however, Willey declined to give Jacobs a price.

30.    On December 6, 2004, Langford sent a pay request to Lovell, the second with respect to the Jacobs' residence, for $19,181.33.  As with Langford's previous invoices, travel, per diem, or expendable costs were additional.  (Plaintiff's Exhibit 30).

31.    Carson sent an invoice to Jacobs on December 13, 2004, which requested a "progress payment" in the amount of $68,625.27 for repairs made to Jacobs' residence, through December 10, 2004.  The billing included amounts for Langford's work, materials used on the job and charged to Carson Construction, and an allocation (based on percentages of overall hours expended rather than actual time) for Carson Construction employees.  (Plaintiff's Exhibit 33).  Carson sent the invoice on the assumption that, although Jacobs had rejected his October 25, 2004, roof replacement bid, Jacobs must have reconsidered and decided to go forward with the job. Similarly, although he and Carson did not specifically communicate about the matter, Lovell concluded that Jacobs must have at some time agreed to have the residence repaired.

32.    Lovell paid Langford's November 18, 2004, invoice in full on December 16, 2004, without dispute.  The amount of $23,714.57 remitted by Lovell towards the Jacobs' job included  $14,449.04 as billed, plus the travel, per diem, and expendable costs Lovell had additionally allocated to the project. (Plaintiff's Exhibits 51, 93).

33.    Jacobs was shocked and upset when he received the December 13th invoice from Carson Construction for $68,625.27.  Jacobs called Carson shortly after the bill arrived, demanding to know what the bill was for and why he was receiving it.  Carson explained that Carson-Lovell was seeking to collect for the monies charged to it by Langford for work performed on his residence.  Jacobs replied that he did not have a contract with Carson-Lovell but rather had an agreement directly with Langford for the work, based on prices provided by Bryan.

34.    A December 17, 2004, update prepared by Willey for Langford indicated that the installation of insulation and sheetrock was underway at the Jacobs' residence, with Barton and his crew expected to finish the sheetrock.  Willey also anticipated that windows would be installed that week.  (Plaintiff's Exhibit 35).

35.     On December 17, 2004, Langford sent a pay request to Lovell, the third with respect to the Jacobs' residence, for $13,310.18.  An additional amount for travel, per diem, and expendable costs was also invoiced. (Plaintiff's Exhibit 34).

36.     Bryan sent a letter to Jacobs dated December 28, 2004, that outlined the work Landford had completed on Jacobs' residence.  As he had in  the previous letters to Jacobs, Bryan also thanked Jacobs for the opportunity to assist with the project and noted that Langford agreed to provide all material, labor, equipment, and supervision for the described work. (Plaintiff's Exhibit 36).

37.     Bryan wrote no cost estimate letters for any customers in Pensacola other than Jacobs. In preparing and submitting the letters to Jacobs, Bryan did not act with the Langford brothers' or Willey's knowledge.  At the time he wrote the letters Bryan made duplicates for Jacobs, Willey, and Carson; he personally gave copies to Jacobs, left copies for Willey on Willey's desk in Georgia along with other receipts and papers, and delivered copies to Carson at his office on Twelfth Avenue in Pensacola by giving them to his bookkeeper Heather Kelly.  Neither Willey nor Carson, however, received the copies of the letters at the times Bryan prepared and submitted them.[7]

38.     In the months after the storm Carson often was very difficult to reach and frequently did not return phone calls or respond to messages left for him by the Langford brothers or their employees. Due to the extenuating circumstances in the aftermath of Hurricane Ivan, the distinction between Carson-Lovell and Carson Construction blurred somewhat although the roles of Carson and Lovell were fairly clear:  Carson primarily worked in the field and Lovell primarily took care of office matters, including accounting.  Additionally, Lovell and Carson did not communicate with each other about business matters as frequently or thoroughly as they did under normal circumstances.

39.     During the course of Langford's work for Carson and Lovell, Steve Langford came to Pensacola briefly on only two occasions and Phil Langford came just four times.  Willey

---

[7] Willey and Carson both so testified.  Moreover, Carson testified that his Twelfth Avenue office was so damaged by Hurricane Ivan that Ms. Kelly did not work out of it at any time after the storm. According to Carson, while Ms. Kelly may have stopped by the Twelfth Avenue office to pick up mail on occasion, she worked from Lovell's office on Reus Street.  Ms. Kelly did not testify at the trial.

initially came to Pensacola weekly, usually for a day or less at a time, until the latter part of October, when his visits became less frequent; he (and, apparently, the Langford brothers) never visited the Jacobs' residence worksite.  Bryan remained in Pensacola full time during this period and, according to Willey, effectively was Langford's on-site project manager for the Jacobs' project.

40.     After his conversation with Lovell regarding the December 13, 2004, invoice for $68,625.27, Jacobs provided Carson with copies of Bryan's cost estimate letters.  Also, on December 29, 2004, Bryan sent copies of the letters by facsimile transmission to Carson.  (Plaintiff's Exhibit 37).

41.     Jacobs had been dissatisfied with the quality of certain repairs made to the residence by Langford, including the manner of installation of some of the windows, doors, flashing, blow-out walls, and sheetrock.  The crew left for the weekend December 29, 2004, telling Jacobs there was a problem between Langford and Carson-Lovell and that they might or might not return after the weekend. Given his dissatisfaction with some of the workmanship as well as the crew's departure for the weekend, Jacobs decided to terminate any further repairs.  On January 2, 2005, Jacobs sent a facsimile message to Bryan requesting that no workers return to the residence "until we talk." (Plaintiff's Exhibit 41).

42.     In a January 4, 2005, e-mail to Lovell, Phil Langford noted that work at the Jacobs jobsite had ceased December 29, 2004, and that Carson had discontinued allowing the Langford workers to charge materials on his accounts.  Phil Langford also asked Lovell to advise as to the status of the unpaid December 6th and 17th invoices and requested payment in full by January 7, 2005.  (Plaintiff's Exhibit 42).

43.     Lovell responded to Phil Langford's e-mail on January 10, 2005.  He stated that Jacobs had supplied copies of Bryan's estimates and that Langford's invoices were considerably higher than the estimates.   Lovell also noted that contrary to the understanding that all work performed by Langford was to be quoted by Carson Construction Company, Bryan had furnished written estimates to Jacobs.  Lovell stated that he and Carson therefore would not be responsible for charges pertaining to the Jacobs' residence on Langford's December 2004 invoices. (Plaintiff's Exhibit 43).

44.     On January 11, 2005, Langford sent a pay request to Lovell, the fourth with respect to the Jacobs' residence, for $30,938.78, plus travel, per diem, and expendable costs. (Plaintiff's Exhibit 45).

45.     Bryan, Willey, Lovell, Carson, and Jacobs met in Pensacola on or about January 14, 2004, to discuss the billing dispute over the Jacobs' residence job.  (Plaintiff's Exhibit 48).   No resolution was reached.

46.     By a single check dated January 31, 2005, in the amount of $54,422.28, Carson-Lovell paid Langford's December 6, 2004; December 17, 2004; and January 11, 2005, invoices.  This amount represented payment in full for outstanding invoices due after deducting the $23,714.57 previously paid to Langford for its work on the Jacobs' residence (which Lovell determined had been paid in error after the Bryan letters came to light) and the remaining $93,438.96 billed by Langford for the Jacobs' residence.  The total amount which Langford invoiced Carson-Lovell for the Jacobs' residence job therefore was $117,153.53.  (Plaintiff's Exhibit 53).

47.     Sometime in January 2005 Steve Langford became aware that Bryan had submitted cost estimate letters to Jacobs.  Steve Langford considered Bryan's actions to be beyond the scope of his position within the Langford company, which he described as a job foreman, but also thought Bryan's estimates were "meaningless" because they did not constitute actual bids.  Bryan was not reprimanded for providing the cost estimate letters but was cautioned that in the future he should follow different procedures.

48.     On February 4, 2005 Lovell sent an invoice to Jacobs for miscellaneous items for the Jacobs' residence job in the amount of $7184.32, but noted that $500.00 could be deducted for plywood that had been returned.  (Plaintiff's Exhibit 54).  Jacobs paid this invoice as requested.

49.     After the departure of the Langford crew, Jacobs hired another contractor to complete the remodeling and repair work to his residence.  The dumpster and portable restrooms rented by Carson Construction remained on the jobsite.  The rental fees were charged to and paid for by Carson Construction, both during the time that Langford worked on the job and also during the time that the replacement contractor was there.  Jacobs

reimbursed Carson Construction for these expenses.

50.     Lovell and Phil Langford exchanged several e-mails between February 7 and February 16, 2005, in which they discussed the Jacobs' billing dispute and steps that might be taken to obtain payment from Jacobs.  Lovell stated to Phil Langford on February 15, 2005 that "We will do everything we know to do get this resolved. I don't think Tony is being fair in reconciling this problem."  (Plaintiff's Exhibit 58).  Although Lovell and Carson had taken the position that they were not contractually responsible for the Jacobs' job, in light of Langford's insistence to the contrary and Lovell's desire to avoid litigation over the dispute if possible, Lovell remained involved in efforts to collect from Jacobs.

51.     Lovell e-mailed Phil Langford on April 12, 2005, attaching a copy of a letter from Jacobs stating that Jacobs had not been aware that Lovell or Carson was involved in the repairs to his residence and that it was agreed at the January 14, 2005, meeting that any monies that Jacobs owed would be paid to Langford.  Referencing his request to Jacobs to provide a letter outlining the pricing and payment arrangements for his job, Lovell stated that "[i]t is getting ridiculous."  (Plaintiff's Exhibit 68).

52.     As of mid-April, 2005 Phil Langford was not aware that Jacobs had paid certain subcontractors and for certain materials personally or that work was continuing on the Jacobs' residence by other contractors.

53.     Jacobs collected approximately $200,000 in insurance proceeds for the damage to his residence and his total expenditure towards the repairing and remodeling work was approximately $200,000. The total amount Langford billed for the Jacobs' residence was $117,153.53.  (Plaintiff's Exhibit 53).  In a letter dated May 17, 2005,  Steve Langford attempted to obtain payment for this amount directly from Jacobs and threatened legal action to collect.  (Plaintiff's Exhibit 73).  Langford has not been compensated in the amount of $117,153.53 from either Carson-Lovell or Jacobs.

   **Conclusions of Law**

       The court has diversity jurisdiction over this contract matter pursuant to 28 U.S.C. § 1332.

       By a preponderance of the evidence, the court finds that:

1.     The agreement discussed at the business meeting attended by the Langfords, Carson, and Lovell and later outlined in Steve Langford's October 4, 2004, e-mail was sketchy, broad, and subject to differences in interpretation and understanding.  The essential agreement that Langford would repair hurricane-damaged properties and perform adjusting services for Carson-Lovell was, however, sufficiently clear and unambiguous to create a contractual relationship between Langford and Carson and Lovell, operating as Carson-Lovell.  See Avatar Dev. Corp. v. De Pani Constr., Inc., 834 So.2d 873, 876 n. 2 (Fla. 4th DCA 2002) (noting that where the language of a contract is clear and unambiguous, the court will enforce such contract according to its terms).

2.     Based on the verbal discussions between Carson and the Langfords, the agreement also included a loose contractual arrangement between Carson Construction and Langford pursuant to which Langford would work under Carson's contractor's license but only on projects bid or authorized by Carson.

3.     Pursuant to the parties' agreement, more repair projects could be added to the initial list of possible jobs for Langford and, subject to Carson's authorization, Langford could commence work on such projects.  In fact, more repair projects were added to the list subsequent to the time the parties first entered into the agreement.

4.     Bryan, acting for Langford, made a binding proposal to perform work on Jacobs' residence for the face amount of the bid(s), which Jacobs accepted.

5.     Bryan's initial proposal (and the subsequent additions or changes) were made without Carson's knowledge or authorization; additionally, the Langfords, Willey, and Lovell did not know of or authorize Bryan's proposals.  Furthermore, neither Carson nor Lovell was aware of the nature of the work proposed by Bryan and executed by Langford nor did they authorize Bryan or Willey to proceed with the work, either prior to or during the time the work was performed.  Although the Langfords, Carson, Lovell, Bryan, and Willey acted with good will, there was wholly insufficient communication among them, resulting in there being no meeting of the minds between the Langfords (or any person authorized to act for Langford Construction) and Carson or Lovell as to repairing and remodeling the Jacobs' residence.  See PS Marinas 3 v. Marina Funding Group, Inc., 889 So.2d 167, 169 (Fla. 3d

DCA 2004) (observing that contracts are to be construed in accordance with the intentions of the parties and that the determination of whether there is a meeting of the minds as to essential elements of an ambiguous contract requires a consideration of all of the surrounding circumstances).

5.      The scope of the agreement between Langford, Carson-Lovell, and Carson Construction did not include work on the Jacobs' residence.

6.      Langford is not entitled to recover under its agreement with Carson-Lovell and Carson Construction for the work it performed on the Jacobs' residence.

7.      Langford's claims of breach of contract, unjust enrichment, and action on a commercial account fail.

        For all of the reasons stated above, it is therefore ORDERED:

1.      The motion to dismiss made by Carson Construction  and Carson-Lovell, which is treated as a motion pursuant to Fed.R.Civ.P. 52(c), is GRANTED.  Langford's claims are DISMISSED, with prejudice.

2.      The clerk is directed to enter judgment in favor of Carson-Lovell and Carson Construction, and against Langford, which shall take nothing in this action.

3.      Taxable costs are assessed against Langford.  The court retains jurisdiction to consider the matter of attorney's fees.

        **DONE and ORDERED** this 27th day of June, 2007.


                              s/ _M. Casey Rodgers_
                          **M. CASEY RODGERS**
                      **UNITED STATES DISTRICT JUDGE**